IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHN A. ALMEDA,

            Petitioner,          No. CIV S-09-1558-MCE-TJB

    vs.

M. MCDONALD,

            Respondent.    <u>ORDER, FINDINGS AND RECOMMENDATIONS</u>

_____/

## I.  INTRODUCTION

Petitioner John A. Almeda is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, (1) Petitioner's requests are denied; and (2) it is recommended that the habeas petition be denied.

## II.  PROCEDURAL HISTORY

On May 16, 2007, Petitioner was convicted of attempted murder, discharge of a firearm from a motor vehicle, and possession of a firearm by a convicted felon, by jury in Sacramento County Superior Court.  *See* Lodged Doc. 7, Clerk's Tr. vol. 2, 350-53.[1]  The jury also found true that Petitioner committed the offenses for the benefit of, at the direction of, and in association

---

[1] When available, the page number assigned by the party is cited for lodged documents. Otherwise, the original page number is used, if there is one.

1  with, a criminal street gang, and that he was "one of the principals [who] intentionally and

2  personally discharged a firearm."  *Id.* at 351.

3      On June 14, 2006, the Superior Court sentenced Petitioner to:  (1) "life in prison,

4  consecutive to 25 years to life," on attempted murder; (2) "five years, consecutive to 25 years to

5  life, stayed pursuant to section 654," on discharging a firearm from a motor vehicle; (3) "two

6  years plus three years, stayed pursuant to section 654," on being a felon in possession of a .40

7  caliber handgun; and (4) "a concurrent two-year term" on being a felon in possession of a .380

8  caliber handgun.  Lodged Doc. 1, at 2.

9      Petitioner directly appealed to the California Court of Appeal, Third Appellate District.

10  *See* Lodged Doc. 1.  On September 5, 2008, the California Court of Appeal issued a reasoned

11  decision affirming the conviction.  *See* Lodged Doc. 4.  Petitioner filed a petition for rehearing,

12  and the California Court of Appeal modified the September 5, 2008, opinion without affecting

13  the judgment and denied the petition.  *See* Lodged Doc. 5.

14      Petitioner filed a petition for review in the California Supreme Court.  *See* Lodged Doc.

15  6.  On December 10, 2008, the California Supreme Court denied the petition without comment or

16  citation.  *Id.*

17      On June 5, 2009, Petitioner filed the original federal habeas petition.  *See* Pet'r's Pet.,

18  ECF No. 1.[2]

19      On June 17, 2009, the Honorable Gregory G. Hollows, the assigned United States

20  Magistrate Judge at the time, appointed the Office of the Federal Defender to represent Petitioner

21  "[i]n light of the length of [P]etitioner's sentence . . . ."  *See* Order 1, June 17, 2009, ECF No. 4.

22

23      [2] The Case Management/Electronic Case Files (CM/ECF) docketing and file system is implemented, which allows the parties to electronically file pleadings and documents.  For

24  pleadings or documents submitted in paper format, the filing is scanned and stored electronically into the CM/ECF system, except for lodged documents.  Each page of the electronic filing is

25  numbered chronologically, whether or not the party numbered it.  If the filing is lengthy, the document is divided into parts.  Here, when a page number for a filed pleading or document is

26  cited, the CM/ECF page number is used when available, which may not coincide with the page number that the parties used.

1   On July 8, 2009, Petitioner moved to substitute attorney Efren Barton Williams, for the Office of

2   the Federal Defender, because "[t]he Federal Defender's Office has determined that it is currently

3   unable to represent [P]etitioner[,]" and "Mr. Williams has agreed to accept the appointment."

4   Pet'r's Mot. for Substitution of Counsel 1, July 8, 2009, ECF No. 8.  On July 20, 2009, the

5   assigned Magistrate Judge at the time granted the motion.  Order 1, July 20, 2009, ECF No. 14.

6       On December 17, 2009, Petitioner filed an amended federal habeas petition.  *See* Pet'r's

7   Am. Pet., ECF No. 23.  On February 16, 2010, Respondent filed an answer, *see* Resp't's Answer,

8   ECF No. 26, to which Petitioner filed a traverse on March 22, 2010.  *See* Pet'r's Traverse, ECF

9   No. 28.

10              III.  FACTUAL BACKGROUND[3]

11          **The Shooting**

12          One evening in the summer of 2006, 16-year-old Angelo S.
            delivered some baby clothes to the home of [Petitioner's] cousin
13          Rudy, for Rudy's pregnant sister.  Angelo previously belonged to
            the Franklon gang, a subset of the Norteños.  Rudy believed
14          Angelo belonged to the Norteño gang because he wore baggy pants
            and carried a rag in his pocket.  Rudy had been previously
15          validated as a Norteño gang member.

16          As Angelo stood in the street, talking on the phone in front of
            Rudy's house, he saw a car drive by.  Angelo heard about six
17          gunshots and fell to the ground.  The gunfire wounded Angelo in
            the back, leg, and stomach, leaving him paralyzed.  At trial, Angelo
18          testified he did not see who was driving the car.  However, prior to
            trial Angelo told a detective that even if he knew who shot him, he
19          would not reveal the shooter's identity.  At trial, Angelo testified
            he did not know [Petitioner] and did not recognize him.  He also
20          denied telling Rudy someone named Perry shot him.

21          Rudy testified he was upstairs checking on his grandmother when
            he heard loud popping noises.  In an earlier statement to detectives,
22          Rudy stated he was outside when the shots were fired.

23

24          [3] These facts are from the California Court of Appeal's opinion issued on September 5,
        2008.  *See* Lodged Doc. 4, at 2-5.  Pursuant to the Antiterrorism and Effective Death Penalty Act
25      of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner
        rebuts that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see Moses*
26      *v. Payne,* 555 F.3d 742, 746 n.1 (9th Cir. 2009); *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir.
        2004).

A neighbor identified Rudy's house as the Almeda house. For five or six years, the neighbor saw [Petitioner] at the house several times a week. The neighbor heard the shots but did not see a car. He ran outside to help Angelo, who did not answer when asked who shot him. Immediately after the shooting Manuel Lopez and his daughter saw a white car with a "T-top" speed away. Since the car windows were tinted, the pair could not see who was driving. Lopez's daughter testified she recognized the car but had seen only an older, grey-haired man driving it before. Previously, she told an investigator she had seen [Petitioner] driving the car prior to the night of the shooting.

A police officer located two .40-caliber shell cases on the ground near Angelo. The cases were fired from the same gun. Officers also found a red towel and an expended bullet at the scene.

At trial, Rudy testified he did not see Angelo lying in the street and denied he saw a car drive by the house. Previously, Rudy told detectives [Petitioner] drove the car and the shots came from the passenger side through the back window. Rudy also stated the car was a T-top. At trial, Rudy denied making the statements.

**The Aftermath**

About two weeks after the shooting, detectives arrested [Petitioner]. Initially, the officers conducted a traffic stop for the car [Petitioner] was believed to be driving. They arrested Perry Trujillo, the driver, and detained a passenger, Irene Medina. Trujillo was a Norteño gang member. Shortly after officers arrested Trujillo, they arrested [Petitioner] at a nearby residence. [Petitioner] had keys for a Nissan Murano in his pocket that he wanted to give to a friend. Officers impounded the Murano as evidence. When they later obtained a search warrant for the vehicle, they located under the front passenger seat a .380-caliber handgun containing nine live rounds. The gun yielded no identifiable prints.

[Petitioner's] girlfriend, Jevon Brown, testified she owned the Murano. Before leaving on a trip the day before [Petitioner's] arrest, Brown gave the car to her mother. She never gave [Petitioner] permission to drive the car while she was gone. Brown did not own a gun. A detective testified Brown told him she gave her mother the car keys so that [Petitioner] could pick up the car and put new rims on it. Brown also told the detective the gun found in the car must have been [Petitioner's]. At trial, Brown denied the comments.

**Gang Evidence**

A gang expert testified that he believed [Petitioner], Perry, Rudy,

4

1    and Angelo all belonged to the Norteño gang.  The expert also
2    testified that various Norteño factions sometimes clash.  According
     to the expert, Angelo was responsible for shooting [Petitioner] in
3    the leg about a year before Angelo was shot.  Based on the
     evidence, the expert opined that the shooting was committed for
4    the benefit of, and in association with, the Norteño gang.

**Defense Case**

[Petitioner] presented his own gang expert.  [Petitioner's] expert
stated the term "Norteño" refers to an identity as opposed to a
particular gang.  Based on the evidence, the expert could not
determine the shooting was related to gang activity.

## IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state

court can be granted only for violations of the Constitution or laws of the United States.  28

U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

*Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999).  Under

AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

*Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

In applying AEDPA's standards, the federal court must "identify the state court decision

that is appropriate for our review."  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

"The relevant state court determination for purposes of AEDPA review is the last reasoned state

5

1  court decision." *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted).

2  "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

3  orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v.*

4  *Nunnemaker*, 501 U.S. 797, 803 (1991).  To the extent no such reasoned opinion exists, courts

5  must conduct an independent review of the record to determine whether the state court clearly

6  erred in its application of controlling federal law, and whether the state court's decision was

7  objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  "The

8  question under AEDPA is not whether a federal court believes the state court's determination

9  was incorrect but whether that determination was unreasonable--a substantially higher

10  threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

11  "When it is clear, however, that the state court has not decided an issue, we review that question

12  *de novo*." *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*,

13  545 U.S. 374, 377 (2005)).

14  ## V.  REQUESTS FOR REVIEW

15  The petition for writ of habeas corpus sets forth two requests.  Petitioner requests:  (1) an

16  order to show cause; and (2) an evidentiary hearing.  *See* Pet'r's Am. Pet. 4.

17  A.  First Request:  Order To Show Cause

18  First, Petitioner requests an order requiring Respondent "to answer the allegations in this

19  Petition and Points and Authorities in Support." *Id.*  As stated earlier, Respondent filed an

20  answer to the petition on February 16, 2009, to which Petitioner filed a traverse on March 22,

21  2010.  Petitioner's request for an order to show cause is denied as moot.

22  B.  Second Request:  Evidentiary Hearing

23  Second, Petitioner requests an evidentiary hearing.  *Id.*  Under 28 U.S.C. § 2254(e)(2), a

24  district court presented with a request for an evidentiary hearing must first determine whether a

25  factual basis exists in the record to support a petitioner's claims and, if not, whether an

26  evidentiary hearing "might be appropriate." *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir.

1999); *see also Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005); *Insyxiengmay v. Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005).  "[W]here the petitioner establishes a colorable claim for relief and has never been afforded a state or federal hearing on this claim, we must remand to the district court for an evidentiary hearing." *Earp*, 431 F.3d at 1167 (citing *Insyxiengmay*, 403 F.3d at 670; *Stankewitz v. Woodford*, 365 F.3d 706, 708 (9th Cir. 2004); *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001)).  In other words, a hearing is required if:  "(1) [the petitioner] has alleged facts that, if proven, would entitle him to habeas relief[;] and (2) he did not receive a full and fair opportunity to develop those facts[.]" *Williams v. Woodford*, 384 F.3d 567, 586 (9th Cir. 2004).

Here, Petitioner's request does not establish that these requirements are satisfied such that an evidentiary hearing would be appropriate.  Petitioner does not allege facts that establish a colorable claim for relief.  *See infra* Part VI.  Petitioner's request for an evidentiary hearing is denied.

This matter is now ready for decision.  For the following reasons, it is recommended that habeas relief be denied.

## VI.  CLAIMS FOR REVIEW

The petition for writ of habeas corpus sets forth three grounds for relief.  First, Petitioner argues his due process rights and his right to present a defense were violated when "the trial court ruled that his alibi witness was unavailable and proceeded with the trial despite defense counsel's motions for continuance and mistrial."  Pet'r's Am. Pet. 15.  Second, Petitioner asserts his right to confront and cross examine witnesses was violated when the trial court allowed "the prosecutor to elicit prejudicial information from a witness in front of the jury after she expressly refused to testify and had previously been held in contempt by the court."  *Id.* at 26, 29.  Third, Petitioner contends the cumulative errors of the first two grounds violated his right to due process and a fair trial.  *Id.* at 33.  Petitioner's claims fail for the following reasons.

///

7

A.  Ground One:  Denial of Motions for Continuance and Mistrial

In ground one, Petitioner argues his Sixth and Fourteenth Amendment rights were violated "by the Court's improper ruling . . . that petitioner's alibi witness was legally unavailable and that the trial should proceed despite defense counsel's requests of continuance and mistrial." *Id.* at 16.  Petitioner asserts his "alibi witness, Faye Roediger, was never allowed to testify due to" this ruling.  *Id.*

1.  State Court Decision

The California Court of Appeal rejected this claim, stating, in part:

**Motions for Continuance and Mistrial**

[Petitioner] argues the trial court erred in denying both his motion for a continuance and motion for a mistrial.  According to [Petitioner], the court denied him his right to present a defense by proceeding to trial even though an alibi witness was considered unavailable.  [Petitioner] contends that under Evidence Code section 240, the witness should not have been deemed unavailable.

*Background*

An investigator for Trujillo interviewed Faye Roediger, who stated [Petitioner] was with her at a hotel in Sacramento at the time of the shooting.  Roediger also provided the investigator with a statement from the hotel, showing she had been registered on the date in question and had charged movies, music, and phone calls to her room.

According to Roediger, she met Trujillo around noon the day of the shooting.  The pair picked up [Petitioner] and a woman named Monica, and the quartet went to a hotel.  Roediger rented a room and for the rest of the day the group stayed in the room.  Around 11:00 p.m., Roediger left to get dinner.

Roediger gave a similar account to [Petitioner's] investigator.  Roediger stated she and her friend Christina picked up Trujillo on the afternoon of the day of the shooting.  They picked up [Petitioner], Monica, and Irene Medina that evening.  Everyone went to the hotel, and Roediger and [Petitioner] split the cost of the room.  Everyone stayed in the room until 11:00 p.m., when Roediger and Christina went out to buy food.  Roediger stayed in the room for an hour after she returned.  She went home, leaving everyone else in the room.

Defense counsel served Roediger with a subpoena commanding

8

her presence at trial on March 26, 2007.  Roediger failed to appear. The trial court issued a bench warrant.  On April 26, 2007, during opening statement at trial, defense counsel informed the jury he intended to call Roediger as a witness, and she would testify that [Petitioner] was with her at a hotel at the time of the shooting.

On May 8, 2007, the trial court determined that there were two outstanding warrants for Roediger's arrest.  The court also stated: "As a material witness [Roediger's] testimony is highly relevant and important to the defense since the defense in this case appears to be alibi."  Roediger's attorney told the court that she was under medical supervision and was not able to leave the medical facility. He stated Roediger was not "avoiding court forever" but was "simply asking for a recess until she's medically cleared."

The following day, the trial court recalled and dismissed the bench warrant since Roediger was unable to leave the medical facility. The Betty Ford Center in Rancho Mirage sent a letter to Roediger's attorney, stating:  "This letter is to inform you that Faye Roediger is presently attending the Intensive Outpatient Program at the Betty Ford Center.  She was admitted May 07, 2007 and her projected discharge date is June 29, 2007."

[Petitioner] moved for a continuance and, in the alternative, for a mistrial.  The court allowed additional time for counsel to determine whether a conditional examination of Roediger was a possibility.  Roediger's attorney stated he believed the facility would not allow the use of video cameras.

On May 14, 2007, defense counsel stated he did not know Roediger's location.  Roediger's attorney notified the court that Roediger remained at the facility, the facility's attorneys had been contacted, and that it would be a "long and involved process."

The court denied both of [Petitioner's] motions.  The court found Roediger unavailable.  Next, the court inquired as to whether any exception to the hearsay rule would permit the admission into evidence of Roediger's prior statement to an investigator, and concluded no exception applied.

The court also indicated it was not inclined to order the county sheriff to travel to a far county to retrieve the witness.  The court noted that not only was the witness far away, but Roediger was also receiving drug therapy and medical personnel would not allow her to travel.  The court excluded Roediger's prior statements to investigators.

***Unavailability of Roediger***

At the outset, the parties disagree over the meaning of the court's determination that Roediger was "unavailable."  [Petitioner] argues

the trial court erred in finding Roediger unavailable, invoking Evidence Code section 240, subdivision (a).  The People disagree, arguing section 240 does not apply.

[Petitioner] concedes a finding of witness unavailability under Evidence Code section 240 "more often arises in cases where a party moves to introduce prior testimony of a witness who cannot testify in person at trial, [but] nothing in that statute limits that definition to those situations, and the definition is equally applicable to the facts here."

Unfortunately, [Petitioner] provides absolutely no authority for his assertion that Evidence Code section 240 applies to the situation in the present case.  Nor did the trial court invoke section 240 during the discussions over Roediger's "availability."  The court simply determined Roediger was unavailable as a witness at that time. Section 240 is not relevant to the resolution of this appeal.

### *Continuance*

[Petitioner] argues the court erred in denying his motion for a continuance.  When a party seeks a continuance to secure the attendance of a witness, the party must show:  (1) he or she has exercised due diligence to secure the witness's attendance, (2) the witness's expected testimony is material and not cumulative, (3) the testimony can be obtained within a reasonable time, and (4) the facts to which the witness would testify cannot otherwise be proven. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037 (*Jenkins*).)

We review a court's denial of a motion for a continuance under an abuse of discretion standard.  (*Jenkins, supra*, 22 Cal.4th at p. 1037.)  [Petitioner] bears the burden of showing the court abused its discretion, i.e., that the court's decision exceeds the bounds of reason under the circumstances.  (*People v. Beeler* (1995) 9 Cal.4th 953, 1003; *In re Lawanda L.* (1986) 178 Cal.App.3d 423, 428.) Here, although the trial court expressed its belief that Roediger's testimony was material, [Petitioner] cannot show Roediger's testimony could have been obtained within a reasonable time. Roediger was enrolled in the Intensive Outpatient Program at the Betty Ford Center with a scheduled release date of June 29, 2007, 51 days from the date of [Petitioner's] motion for a continuance.

Under the circumstances, the court did not abuse its discretion in denying the motion.  The court allowed counsel almost a week to gather more information about Roediger's availability and the possibility of a conditional exam.  The court's decision not to continue the trial for 51 days when all the evidence except for Roediger's testimony had been presented was not an unreasonable abuse of discretion.

*Mistrial*

[Petitioner] also argues the trial court abused its discretion in denying his motion for a mistrial based on Roediger's unavailability to testify.  According to [Petitioner], the court's denial of his motion prevented him from receiving a fair trial.

Due process affords a defendant a meaningful opportunity to present a complete defense.  (*California v. Trombetta* (1984) 467 U.S. 479, 485 [81 L.Ed.2d 413, 419].)  The trial court should grant a motion for a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged by an error.  We review the court's denial of a mistrial motion for an abuse of discretion.  (*People v. Ayala* (2000) 23 Cal.4th 225, 282.)

[Petitioner] argues the lack of Roediger's testimony deprived him of the ability to present a complete defense.  However, although Roediger did not testify regarding [Petitioner's] alleged alibi, nothing prevented [Petitioner] from presenting testimony by the other occupants of the hotel room on the day in question.  [Petitioner] argues "[t]here could be [a] myriad [of] other reasons why [Petitioner] could not, or chose not to, offer the testimony of others present in the hotel room that evening."  Regardless of the reasons [Petitioner] chose not to use other avenues to pursue an alibi defense, we cannot, under the circumstances, find the trial court abused its discretion in denying [Petitioner's] motion for a mistrial.

Lodged Doc. 4, at 6-11.

2.  Analysis of Denial of Motion for Continuance

In *Washington v. Texas*, 388 U.S. 14, 19 (1967), the Supreme Court held that the right of

an accused to have compulsory process for obtaining witnesses in his or her favor applies in state

criminal proceedings.  The Supreme Court observed:

The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.  Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process of law."

*Id.*

Here, however, Petitioner's reliance on compulsory process cases and cases holding that

11

1  criminal defendants have a constitutional right, implicit in the Sixth Amendment, to present a

2  defense is misplaced.  The trial court did not exclude Roediger's testimony or refuse Petitioner

3  the use of compulsory process to obtain Roediger's presence at trial.  Rather, the trial court

4  denied the defense request for a continuance after Roediger failed to appear at trial.

5        Trial courts are accorded broad discretion on matters regarding continuances.  *See Morris*

6  *v. Slappy*, 461 U.S. 1, 11-12 (1983); *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).  However,

7  there are cases holding that a trial court's failure to grant a defendant a continuance may violate a

8  defendant's right to due process or other constitutional rights.  *See*, *e.g.*, *Schrader v. Whitley*, 904

9  F.2d 282, 288 (5th Cir.) (right to confront witnesses), *cert. denied*, 498 U.S. 903 (1990); *Armant*

10  *v. Marquez*, 772 F.2d 552, 556-58 (9th Cir. 1985) (Sixth Amendment right to

11  self-representation), *cert. denied*, 475 U.S. 1099 (1986); *Bonin v. Vasquez*, 807 F. Supp. 589, 608

12  (C.D. Cal. 1992) (effective assistance of counsel), *aff'd*, 59 F.3d 815 (9th Cir. 1995), *cert.*

13  *denied*, 516 U.S. 1051 (1996).

14        Whatever the basis of the challenge, the denial of a continuance is reviewed for abuse of

15  discretion.  *See Morris*, 461 U.S. at 11-12 ("[O]nly an unreasoning and arbitrary 'insistence upon

16  expeditiousness in the face of a justifiable request for delay'" violates a defendant's rights.);

17  *Armant*, 772 F.2d at 556.  In *Armant*, the Ninth Circuit recited the four factors used to determine

18  whether the trial court abused its discretion in denying a requested continuance:  (1) the degree of

19  diligence by the petitioner prior to seeking the continuance; (2) whether the continuance would

20  have served a useful purpose; (3) whether the continuance would have inconvenienced the court

21  or the prosecution; and (4) the amount of prejudice suffered by the petitioner.  *Armant*, 772 F.2d

22  at 556-57; *see also*, *e.g.*, *Gallego v. McDaniel*, 124 F.3d 1065, 1072 (9th Cir. 1997), *cert. denied*,

23  542 U.S. 922 (1998), *and* 524 U.S. 917 (1998).

24        Here, the California Court of Appeal reasonably determined that the trial court's denial of

25  the continuance request was not an abuse of discretion.  Roediger was "subpoenaed as a witness

26  by the defense" and failed to appear.  Lodged Doc. 9, Rep.'s Tr. vol. 3, 822-23.  On May 8, 2007,

1   Kenneth Rosenfeld, Roediger's counsel, appeared, and explained to the trial court Roediger had

2   two bench warrants[4] for her arrest due to her failure to appear.  *Id.*  Defense counsel then asserted

3   that Roediger was a "highly relevant" witness, which the trial court restated:

4                       [DEFENSE COUSENL:]  [Roediger] is -- I don't think there is any
                       question she is highly relevant.

5   

6                       THE COURT:  Okay.  As a material witness[,] her testimony is
                       highly relevant and important to the defense since the defense in
                       this case appears to be [an] alibi.

7   

8   *Id.* at 824.  Defense counsel added he was trying to locate Roediger, and his "investigator has

9   come up with more or less [a] dead end."  *Id.*

10         The trial court recounted that Roediger was in rehabilitation for a serious addiction.  *Id.*

11   Rosenfeld admitted his client was "under medical supervision at this time and not free to leave

12   where she is at right now."  *Id.* at 825.  Rosenfeld stated "the process of gathering information to

13   show good cause" for why Roediger did not appear was not a simple, "overnight procedure," *id.*

14   at 827, and at that time, Rosenfeld also did not know when Roediger would be available.  *Id.* at

15   828.  Rosenfeld requested until tomorrow, May 9, 2007, to gather information, which the trial

16   court granted.  *Id.* at 832-33.

17         On May 9, 2007, the trial court dismissed the bench warrant it issued.  Lodged Doc. 9,

18   Rep.'s Tr. vol. 4, 958.  The trial court then stated it wanted to disclose the date when Roediger

19   would be available so "the court can determine whether or not it's an abuse of discretion to grant

20   or deny that continuance."  *Id.* at 960.  Roediger's attorney agreed, "Absolutely, Your Honor."

21   *Id.*  The trial court disclosed that Roediger "would be available 51 days from today on the 29th of

22   June."  *Id.*; *see also* Lodged Doc. 8, Augmented Clerk's Tr. vol. 1.  Defense counsel moved for a

23   continuance, and, if that was denied, then for mistrial.  Lodged Doc. 9, Rep.'s Tr. vol. 4, 960.

24   The trial court brought up that "[t]here is . . . the possibility of a conditional exam."  *Id.* at 961.

25   

26        [4] The trial court in the instant case issued one of the bench warrants, and the other bench
   warrant was "issued by Judge Bakarich in department 4."  Lodged Doc. 9, Rep.'s Tr. vol. 4, 958.

1   The court gave the parties until May 14, 2007, to determine whether the parties could "either

2   schedule a conditional exam or have another witness or have closing arguments." *Id.* at 1001.

3       On May 14, 2007, Rosenfeld was unable to appear, but did tell defense counsel, who

4   relayed the message to the trial court, that Rosenfeld "ha[d] nothing new to add to the

5   representations or statements or otherwise that he has given to the court." *Id.* at 1002-03.  The

6   trial court verified the message:

> THE COURT:  All right.  [Rosenfeld] notified the court that
> nothing has changed, that the only new information that I have is
> the attorneys who represent the place where [Roediger] is -- it's a
> major law firm in New York City and that the place has been
> contacted and it is a long and involved process.

10  *Id.* at 1003.  The trial court then denied the motions for continuance and mistrial.  *Id.*

11      The record shows the California Court of Appeal properly found that "the court allowed

12  counsel almost a week to gather more information about Roediger's availability and the

13  possibility of a conditional exam."  Lodged Doc. 4, at 10.  Granting the continuance would have

14  inconvenienced the trial court because the trial would have to be continued for "51 days when all

15  the evidence except for Roediger's testimony had been presented."  *Id.*  Habeas relief is not

16  warranted based on the denial of the motion for a continuance.

17          3.  Analysis of Denial of Motion for Mistrial

18      Under both California and federal law, the decision on whether to grant a mistrial motion

19  also is within the trial court's discretion.  *See Corley v. Cardwell*, 544 F.2d 349, 351 (9th Cir.

20  1976) ("The trial judge has a broad discretion in granting a mistrial . . . and the burden is on the

21  defendant to establish an abuse of that discretion." (citing *Illinois v. Somerville*, 410 U.S. 458

22  (1973); *Oelke v. United States*, 389 F.2d 668 (9th Cir. 1967))), *cert. denied*, 429 U.S. 1040

23  (1977); *People v. Cox*, 30 Cal. 4th 916, 953, 135 Cal. Rptr. 2d 272, 70 P.3d 277 (2003) ("We

24  review the denial of a motion for mistrial under the deferential abuse of discretion standard.  A

25  motion for mistrial is directed to the sound discretion of the trial court." (citations omitted)).  To

26  establish a due process violation from trial-type error, such as the denial of a mistrial motion, the

1   petitioner must show that the error resulted in a trial that was fundamentally unfair.  *See Estelle v.*

2   *McGuire*, 502 U.S. 62, 70-71, 75 (1991); *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th

3   Cir. 1986) (as amended).

4   Here, Petitioner has not shown that his trial was rendered fundamentally unfair by the

5   trial court's denial of the mistrial motion.  Although Roediger was unavailable to testify, through

6   no fault of the trial court, Petitioner still had a fair opportunity to present a defense.  According to

7   Roediger, she and Petitioner were with at least two other individuals at the time of the shooting,

8   who could have provided an alibi defense.  Lodged Doc. 4, at 6-7.  The trial court did not prevent

9   Petitioner from calling the others as alibi witnesses, and nothing in the record shows Petitioner

10  attempted to call them as witnesses.  Petitioner also could not guarantee Roediger would be

11  available to testify at a later date.

12  Further, the evidence of Petitioner's guilt was strong.  Detective Hanspeter Merten

13  testified that Rudy told him Petitioner "had been the driver in a vehicle that had shot at his

14  friend[,] Mr. Savala[,] and he stated it was his cousin."  Lodged Doc. 9, Rep.'s Tr. vol. 3, 619.

15  According to Detective Merten, Rudy also said the vehicle was a "T-top."  *Id.* at 636.  Dale Joe,

16  an investigator for the District Attorney's office, also testified that Felicia Servantes told him that

17  she had seen Petitioner driving the white "T-top" vehicle.  Lodged Doc. 9, Rep.'s Tr. vol. 4, 993-

18  94.  Additionally, Detective Alvaro Sanchez testified that Jevon Brown, Petitioner's girlfriend,

19  told Detective Sanchez that the black gun "must belong to [Petitioner] since he was driving the

20  car Tuesday."  Lodged Doc. 9, Rep.'s Tr. vol. 2, 425.  Other exhibits admitted into evidence also

21  showed Petitioner holding the black gun.  Lodged Doc. 8, Augmented Clerk's Tr. vol. 2, 4-5.[5]

22  The California Court of Appeal's rejection of Petitioner's claim relating to the denial of the

23  mistrial motion was neither contrary to, nor an unreasonable application of, clearly established

24

25      [5] Two volumes were labeled under Lodged Document 8:  (1) the first volume of the Augmented Clerk's Transcript; and (2) the second volume of what was labeled as the "Clerk's Transcript."  It is assumed that this second volume was mislabeled and is part of the Augmented

26  Clerk's Transcript, not the Clerk's Transcript.

1   federal law.

2       B.  Ground Two:  Permitting Extensive Questioning of Irene Medina

3           In ground two, Petitioner claims that the trial court erred in permitting Irene Medina to be

4   questioned on the witness stand, even after it became clear that she would refuse to answer

5   certain questions.  *See* Pet'r's Am. Pet. 29.  Petitioner asserts the "improper questioning was

6   highly prejudicial" because "the only impression the jury could have derived from this series of

7   questions was that Medina told Merten that [P]etitioner had a white T-top, which was disposed

8   of after [the victim] was shot, and that [Petitioner] owned a black gun . . . ."  *Id.*  According to

9   Petitioner, "the jury inevitably must have concluded that [Medina] was not going to admit in

10  court to having made these statements for fear of being labeled a 'snitch.'"  *Id.*

11        1.  State Court Decision

12          The California Court of Appeal provided its legal and factual bases for rejecting the claim

13  as follows:

14          **Medina's Testimony**

15          [Petitioner] contends the trial court violated his right to confront
        and cross-examine witnesses by allowing the prosecution to
16          question Irene Medina after she refused to take the oath and answer
        any questions.

17
        ***Background***
18
        The prosecution called Medina as a witness.  However, Medina
19          refused to swear or affirm that she would tell the truth.  After the
        court excused the jury, Medina informed the court she did not want
20          to say anything.  The court informed her she could be held in
        contempt, but Medina reaffirmed her intent not to testify.  The
21          court proposed bringing the jury back in and allowing Medina to
        refuse to answer questions in its presence.  [Petitioner] objected
22          that Medina was not a witness and should not be made to refuse to
        answer questions in front of the jury.
23
        The jury returned to the courtroom and the court asked Medina if
24          she would take the oath.  Medina refused.  The court allowed the
        prosecution to proceed "[i]n view of the absence of the oath."
25          [Petitioner] again objected, "based on the fact there's no witness
        present."  The court found the witness had been lawfully produced,
26          and the prosecution asked Medina whether she was interviewed by

a police detective.  Medina refused to answer.

The court ruled Medina in contempt of court for her failure to answer.  Following another defense objection, the prosecution played seven seconds of a DVD depicting Medina's interview with detectives.  No sound played.

The prosecution asked Medina:  "Miss Medina, does [Petitioner] have a white T-top vehicle?  [¶]  A.  I'm not answering.  [¶]  The Court:  All right.  Miss Medina, I'm going to direct you to answer that question.  [¶]  Are you going to refuse to do that?  [¶]  The Witness:  Yes. [¶]  The Court: []Go ahead, Mr. Thinh [prosecutor]. [¶]  Q.  (By Mr. Thinh) Miss Medina, does [Petitioner] have a black gun?  [¶]  A.  I'm not -- not answering.  [¶]  The Court:  All right.  Miss Medina, again I'll order you to answer the question. [¶]  Are you going to refuse to do that?  [¶]  The Witness:  Yes. [¶] Q.  (By Mr. Thinh) Miss Medina, did [Petitioner] ever tell you that his white T-top was gone after the shooting of Angelo [S.]?  [¶]  A. I'm not answering."

The prosecutor concluded by asking Medina whether she knew what the word "snitch" meant, and Medina again refused to answer.  After excusing the jury, the court remanded Medina into custody for five days.  The court then brought the jury back in; instructed it that because only a witness's answers are evidence, anything contained in the questions was not evidence; and sent the jury home for the day.

Once the jury left the courtroom, the prosecutor informed the court he intended to present a witness to authenticate Medina's statement to detectives reflected in the DVD.  Defense counsel objected, arguing Medina's statements contained inadmissible hearsay.  The court stated Medina's refusal to testify rendered her legally unavailable, thereby permitting her recorded interview to be introduced as a prior inconsistent statement.

Defense counsel moved for a mistrial, arguing the court violated [Petitioner's] right to confront witnesses by allowing the prosecutor to question Medina without her being sworn. According to defense counsel, the questions strongly suggested facts known to the prosecutor that Medina refused to divulge.  The jury, defense counsel argued, would not be able to ignore this inference, even though instructed to do so by the court.  The court denied the motion after reiterating it had instructed the jury that the prosecution's questions were not evidence.

The prosecution did not call any other witness regarding the taped interview.  The DVD of the interview was never played for the jury and was ultimately withdrawn.

### Discussion

Under the confrontation clause of the Sixth Amendment to the United States Constitution, a defendant has the right to confront and cross-examine witnesses presented against him. (*Douglas v. Alabama* (1965) 380 U.S. 415, 418 [13 L.Ed.2d 934, 937] (*Douglas*).)  A defendant states a violation of the confrontation clause by showing he was prohibited from engaging in otherwise appropriate cross-examination designed to show bias on the part of the witness, exposing to the jury information from which the jury could judge the reliability of witnesses. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 [89 L.Ed.2d 674, 684].)

[Petitioner] contends the court violated this right to confront witnesses by allowing the prosecutor to question Medina after she refused to take the oath and the court found her in contempt.  According to [Petitioner], the only impression the jury could have derived from the prosecution's questions to Medina was that Medina told detectives [Petitioner] had a T-top car and owned a black gun.  [Petitioner] argues "the jury inevitably must have concluded that she was not going to admit in court to having made these statements for fear of being labeled a 'snitch.'"

Both parties agree that a prosecutor is not required to accept at face value a witness's refusal to testify, and may compel a witness to refuse to answer specific questions.  However, a prosecutor cannot, under the guise of cross-examination, elicit before a jury what is tantamount to devastating direct testimony without depriving the defendant of the right to confront the witness. (*People v. Rios* (1985) 163 Cal.App.3d 852, 868-869.)

[Petitioner] argues the prosecution's questioning of Medina elicited just such devastating direct testimony.  We disagree.

[Petitioner] argues the present case presents error comparable to that found in *Douglas* and *People v. Barajas* (1983) 145 Cal.App.3d 804 (*Barajas*).  In *Douglas*, after the defendant's codefendant refused to answer any questions regarding the alleged crime, the prosecution produced an alleged confession signed by the codefendant.  While cross-examining the nonresponsive codefendant, the prosecution read from the document, pausing frequently to ask the codefendant if those were his words.  The codefendant continued to refuse to answer, and the prosecution managed to read the entire document to the jury. (*Douglas*, *supra*, 380 U.S. at pp. 416-417.)

The Supreme Court reversed the conviction.  The court found the alleged confession constituted the only direct evidence that the defendant had fired a gun during the commission of the crime.  Although the prosecution's reading of the alleged confession was not technically testimony, the court noted the prosecution's reading

of the confession might well have been the equivalent in the jury's mind of testimony that the codefendant made the statement and that it was true. (*Douglas*, *supra*, 380 U.S. at pp. 419-420.)

In *Barajas*, the witness who identified the defendant as one of the robbers involved in a murder subsequently recanted the identification. In his opening statement, the prosecution stated he would call a witness who would identify the defendant as one of the robbers. The prosecution called the witness, but the witness refused to answer any questions. The court allowed the prosecution to ask the witness whether his refusal to testify was the result of direct threats. The witness again refused to testify. (*Barajas*, *supra*, 145 Cal.App.3d at pp. 806-808.)

The appellate court reversed. The court noted a prosecutor may not, under the guise of cross-examination, get before the jury what is tantamount to devastating direct testimony. The prosecutor, through his opening statement and questioning of the nonresponsive witness, told the jury the witness had seen the crime and identified the defendant, but refused to testify out of fear for his life. (*Barajas*, *supra*, 145 Cal.App.3d at p. 810.)

We do not find the facts before us comparable to those considered by the courts in *Douglas* and *Barajas*. Here, the jury was instructed not to consider the prosecution's questions as evidence. Moreover, admissible evidence from other sources was presented to the jury on topics covered by the questions. The inadmissible questions were not the only source of information to the jury.

The prosecution asked Medina if [Petitioner] had a T-top vehicle and if he had a black gun. In an interview with detectives, Rudy identified [Petitioner] as the driver of the T-top, the car from which the shots were fired. Exhibits entered into evidence showed [Petitioner] holding a black gun. Given this prior testimony and evidence, we disagree with [Petitioner] that the prosecution's questioning of Medina elicited "devastating" evidence against [Petitioner]. We find no violation of [Petitioner's] constitutional right to cross-examine witnesses.

Lodged Doc. 4, at 12-17.

       2. Analysis of Claim Regarding Extensive Questioning of Irene Medina

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Confrontation Clause of the Sixth Amendment provides a criminal defendant with the right to face those who testify against him and the right to conduct cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51

1   (1987).  The Sixth Amendment's Confrontation Clause applies to the states through the

2   Fourteenth Amendment.  *Pointer v. Texas*, 380 U.S. 400, 401 (1965).

3          The California Court of Appeal's rejection of this claim was not contrary to Supreme

4   Court authority, and they correctly cited that authority, *Douglas v. Alabama*, 380 U.S. 415

5   (1965).  Nor did the California Court of Appeal unreasonably apply *Douglas* in distinguishing

6   that precedent.  The record reflects that first, Medina refused to take the oath, despite repeated

7   requests:

8                    THE CLERK:  Please raise your right hand.  Do you solemnly
                 swear that the testimony you present will be the truth, the whole
9                    truth, and nothing but the truth so help you God?

10                   [MEDINA:]  No.

11                   THE CLERK:  You do not swear?

12                   [MEDINA:]  (Witness shaking head negatively.)

13                   . . . .

14                   THE COURT: . . . [A]m I correct in assuming you are not taking
                 the oath because you simply don't want to testify?
15
                 [MEDINA:]  (Witness nodding head affirmatively.)
16
                 THE COURT:  What is your situation?
17
                 [MEDINA:]  I don't want to say anything.
18

19   Lodged Doc. 9, Rep.'s Tr. vol. 2, 393-94.  The trial court warned Medina that she could be held

20   in contempt, and asked if she understood.  *Id.* at 394.  Medina nodded her head affirmatively.  *Id.*

21   Medina also answered that, at the time of the trial, she was "serving time" for three months and

22   was supposed to be released on May 10, 2007.  *Id.* at 395.  The trial court warned Medina, again,

23   that she could be held in custody for each act of contempt, which could run consecutive to

24   whatever sentence she was serving, and that she could be fined "up to $1,000 for actual

25   contempt."  *Id.* at 396.  Still, Medina refused to testify.  *Id.*

26          The trial court asked if Medina would take the oath again, which Medina refused.  *Id.* at

399.  The trial court once again advised Medina of the consequences for refusing to testify, which Medina affirmed she understood.  *Id.* at 400.  Medina still would not testify.  *Id.*  The trial court eventually found Medina was in contempt and allowed the State to ask several questions:

> THE COURT:  All right.  The witness will be adjudged in contempt of court for failure to answer [the State's] question.
>
> Next question.
>
> [THE STATE:]  Thank you, Your Honor.  Can I have this marked People's next in order, Your Honor?
>
> THE COURT:  All right.
>
> THE CLERK:  61.
>
> . . . .
>
> [DEFENSE COUNSEL:]  For the record I object to this procedure as well.
>
> The court is going to afford him the opportunity to play the beginning of this tape.
>
> Is that correct?
>
> THE COURT:  That's correct.
>
> [THE STATE:]  Miss Medina, I'm showing you what's been marked people's exhibit number 61 for identification. . . . [I]s this . . . you on the video that's depicted in people's exhibit number 61 for identification?
>
> [MEDINA:]  I don't want to answer nothing.
>
> I'm not going to say anything.
>
> THE COURT:  All right.  Miss Medina, I'm going to direct you to answer that question.
>
> Are you going to refuse to do that?
>
> [MEDINA:]  Yes.
>
> THE COURT:  Go ahead, Mr. Thinh.
>
> [THE STATE:]  Miss Medina, does [Petitioner] have a black gun?
>
> [MEDINA:]  I'm not -- not answering.

21

THE COURT:  All right.  Miss Medina, again I'll order you to answer the question.

Are you going to refuse to do that?

[MEDINA:]  Yes.

[THE STATE:]  Miss Medina, did [Petitioner] ever tell you that his white T-top was gone after the shooting of Angelo Savala?

[MEDINA:]  I'm not answering.

THE COURT: All right.  Again, Miss Medina, you'll be ordered to answer the question.

Are you going to refuse to answer?

[MEDINA:]  Yes.

Yes.

[THE STATE:]  Miss Medina, I'm showing what's been marked people's exhibit number 42 for identification.

Do you recognize anyone that is depicted in picture 42 for identification?

[MEDINA:]  I'm not answering.

THE COURT:  All right.  Again, Miss Medina, I'll direct you to answer that question.

Are you going to refuse to do so?

[MEDINA:]  Yes.

THE COURT:  All right.

[THE STATE:]  Miss Medina, do you know what the word snitch means?

[MEDINA:]  I'm not answering.

THE COURT:  All right.  Miss Medina, again I'll direct you to answer the question.

Are you going to refuse to do so?

[MEDINA:]  (Witness nodding head affirmatively.)

Yes.

1   [THE STATE:]  Miss Medina, do you want to testify today?

2   [MEDINA:]  I'm not answering.

3   THE COURT:  Miss Medina, I'll direct you to answer that
    question.
4
    Are you going to refuse to answer?
5
    [MEDINA:]  Yes.
6
    [THE STATE:]  Your Honor, at this point obviously I do have
7   other questions.

8   But I'm going to submit to the court.

9   . . . .

10  THE COURT: . . . We did have a -- the witness who refused to
    testify -- I think I told you in the beginning instruction that
11  questions are not evidence.  Only the witness's answers are
    evidence.
12
    So anything that was contained in the questions is not evidence and
13  shouldn't be assumed by you to be true.

14  Only answers are evidence.

15  *Id.* at 401-04, 406.

16      The California Court of Appeal did not apply *Douglas* unreasonably in distinguishing it,

17  in the following two ways, from this case.  First, the state appellate court pointed out that here,

18  "the jury was instructed not to consider the prosecution's questions as evidence."  Lodged Doc.

19  4, at 17; *see* Lodged Doc. 9, Rep.'s Tr. vol. 2, 406.  Second, the California Court of Appeal noted

20  that "admissible evidence from other sources was presented to the jury on topics covered by . . .

21  the inadmissible questions."  Lodged Doc. 4, at 17.  The record shows the prosecution had asked

22  Medina if Petitioner had a T-top vehicle and a black gun.  Lodged Doc. 9, Rep.'s Tr. vol. 2, 402.

23  Detective Merten testified that Rudy told him Petitioner was the driver of the T-top vehicle.

24  Lodged Doc. 9, Rep.'s Tr. vol. 3, 619.  Further, Detective Sanchez testified that Brown told him

25  the black gun belonged to Petitioner.  Lodged Doc. 9, Rep.'s Tr. vol. 2, 425.  Photographs

26  admitted into evidence also revealed Petitioner holding the black gun.  Lodged Doc. 8,

1   Augmented Clerk's Tr. vol. 2, 4-5.

2        Even if the trial court violated Petitioner's Sixth Amendment rights, any error was

3   harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  Confrontation Clause violations are

4   subject to harmless error analysis.  *Holley v. Yarborough*, 568 F.3d 1091, 1100 (9th Cir. 2009);

5   *Whelchel v. Washington*, 232 F.3d 1197, 1205-06 (9th Cir. 2000).  "In the context of habeas

6   petitions, the standard of review is whether a given error 'had substantial and injurious effect or

7   influence in determining the jury's verdict.'"  *Christian v. Rhode*, 41 F.3d 461, 468 (9th Cir.

8   1994) (quoting *Brecht*, 507 U.S. at 637).  Factors to be considered when assessing the

9   harmlessness of a Confrontation Clause violation include the importance of the testimony,

10  whether the testimony was cumulative, the presence or absence of evidence corroborating or

11  contradicting the testimony, the extent of cross-examination permitted, and the overall strength

12  of the prosecution's case.  *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

13       Here, any purported error was harmless, as the inadmissible questions were covered by

14  other admissible evidence, and the prosecution's case against Petitioner was strong.  As stated

15  earlier, Rudy told Detective Merten that Petitioner was the driver of the T-top vehicle that shot

16  the victim.  Lodged Doc. 9, Rep.'s Tr. vol. 3, 619.  Servantes also told Investigator Joe that she

17  had seen Petitioner driving the T-top vehicle.  Lodged Doc. 9, Rep.'s Tr. vol. 4, 993-94.

18  Petitioner's girlfriend told Detective Sanchez that the black gun was Petitioner's gun, Lodged

19  Doc. 9, Rep.'s Tr. vol. 2, 425, and photographs admitted into evidence showed Petitioner holding

20  a black gun.  Lodged Doc. 8, Augmented Clerk's Tr. vol. 2, 4-5.  Habeas relief is unavailable on

21  this claim.

22       C.  Ground Three:  Cumulative Error

23       In ground three, Petitioner argues that the cumulative effect of errors in the first and

24  second grounds violated his constitutional due process rights.  Pet'r's Am. Pet. 33.  Respondent

25  argues this claim is unexhausted, but that in any case, the claim is not colorable and should be

26  denied on the merits.  Resp't's Answer 26.  Because exhaustion is a procedural defect that could

1   prevent consideration of any of the claims in the current petition, *Rose v. Lundy*, 455 U.S. 509,

2   522 (1982) ("[W]e hold that a district court must dismiss habeas petitions containing both

3   unexhausted and exhausted claims."), the exhaustion issue is addressed prior to addressing this

4   claim's merits.

5                          1.  Legal Standard for Exhaustion

6              "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available

7   state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon

8   and correct' alleged violations of prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29

9   (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam)).  "The state courts

10  have been given a sufficient opportunity to hear an issue when the petitioner has presented the

11  state court with the issue's factual and legal basis." *Weaver v. Thompson*, 197 F.3d 359, 364 (9th

12  Cir. 1999) (citing *Duncan*, 513 U.S. at 365 (legal basis); *Correll v. Stewart*, 137 F.3d 1404,

13  1411-12 (9th Cir. 1998) (factual basis)).  "A petitioner has satisfied the exhaustion requirement

14  if:  (1) he has 'fairly presented' his federal claim to the highest state court with jurisdiction to

15  consider it, . . . or (2) he demonstrates that no state remedy remains available." *Johnson v.

16  Zenon*, 88 F.3d 828, 829 (9th Cir. 1996) (citations omitted).

17             To have exhausted via the first avenue, a petitioner must have presented each federal

18  claim as a federal claim to the California Supreme Court on (1) direct review (e.g., in a petition

19  for review); or (2) collateral review (e.g., in a petition for a writ of habeas corpus).  *See Reiger v.

20  Christensen*, 789 F.2d 1425, 1427 (9th Cir. 1986); *see also O'Sullivan v. Boerckel*, 526 U.S. 838,

21  845 (1990); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) ("To 'fairly present' [a]

22  federal claim to the state courts, [a petitioner] had to alert the state courts to the fact that he was

23  asserting a claim under the United States Constitution." (citing *Duncan*, 513 U.S. at 365-66)).  A

24  "mere similarity between a claim of state and federal error is insufficient to establish

25  exhaustion." *Duncan*, 513 U.S. at 366.

26             A claim is considered exhausted via the second avenue "'if it is clear that [the habeas

                                              25

1  petitioner's] claims are now procedurally barred under [state] law.'"  *Gray v. Netherland*, 518

2  U.S. 152, 162-63 (1996) (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989)); *see also*

3  *Valerio v. Dir. of the Dep't of Prisons*, 306 F.3d 742, 770 (9th Cir. 2002) ("[T]he claim is

4  exhausted because it is procedurally barred.").  A claim is also "exhausted because a return to

5  state court for exhaustion would be futile."  *Phillips*, 267 F.3d at 974 (citation and internal

6  quotation marks omitted).

7                        2.  Analysis of Exhaustion

8          Here, Petitioner raised his cumulative error claim on direct appeal in the California Court

9  of Appeal, *see* Lodged Doc. 1, at 45-46, but did not raise it in his petition for review in the

10 California Supreme Court.  *See* Lodged Doc. 6.  This claim is either:  (1) unexhausted because

11 the highest state court with jurisdiction did not review the claim, *Johnson*, 88 F.3d at 829; or (2)

12 exhausted because it is procedurally barred.  *Phillips*, 267 F.3d at 974 ("The district court

13 correctly concluded that [the] claims were nonetheless exhausted because a return to state court

14 for exhaustion would be futile."  (citation and internal quotation marks omitted)).

15         Even if Petitioner's claim is unexhausted, an application for a writ of habeas corpus may

16 be denied on the merits, notwithstanding the applicant's failure to exhaust available state

17 remedies.  28 U.S.C. § 2254(b)(2).  A federal court considering a habeas petition may deny an

18 unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable."

19 *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).  The merits of Petitioner's cumulative

20 error claim is addressed as follows.

21                       3.  Analysis of Cumulative Error Claim

22         "Cumulative error occurs when although no single trial error examined in isolation is

23 sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still

24 prejudice[d] a defendant."  *Wooten v. Kirkland*, 540 F.3d 1019, 1022 n.1 (9th Cir. 2008) (quoting

25 *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000)) (internal quotation marks

26 omitted).  A court "must ask whether the aggregated errors so infected the trial with unfairness as

to make the resulting conviction a denial of due process." *Jackson v. Brown*, 513 F.3d 1057, 1085 (9th Cir. 2008) (quoting *Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004)) (internal quotation marks omitted).  "[W]here there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation." *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000).

Here, because no single constitutional error exists, no errors can accumulate to the level of a constitutional violation.  *Id.*  Petitioner is not entitled to relief on this claim.

## VII.  CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.  Petitioner's request for an order to show cause is DENIED as moot; and

2.  Petitioner's request for an evidentiary hearing is DENIED.

IT IS HEREBY RECOMMENDED that Petitioner's application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57 (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of appealability should be issued in the event he elects to file an appeal from the judgment in this

///

///

///

27

case. *See* Rule 11(a), Federal Rules Governing Section 2254 Cases (district court must issue or deny certificate of appealability when it enters final order adverse to applicant).

DATED:          December 7, 2010.

_____
TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE