1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10    JOHN A. ALMEDA,

11              Petitioner,               2:  09 - cv - 1558 KJM TJB

12          vs.

13    M. MCDONALD,

14              Respondent.        ORDER, SUPPLEMENTAL FINDINGS AND

15                                 RECOMMENDATIONS

16    _____/

17                            I.  INTRODUCTION

18          Petitioner is a state prisoner and is proceeding through counsel with a petition for writ of

19    habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted by a jury of attempted

20    murder, discharge of a firearm from a motor vehicle and possession of a firearm by a convicted

21    felon.  The jury also found true that Petitioner committed the offenses for the benefit of, at the

22    direction of, and in association with, a criminal street gang, and that he was one of the principals

23    who intentionally and personally discharged a firearm.

24          On June 14, 2006, the Superior Court sentenced Petitioner to:  (1) "life in prison,

25    consecutive to 25 years to life," on attempted murder; (2) "five years, consecutive to 25 years to

26    life, stayed pursuant to section 654," on discharging a firearm from a motor vehicle; (3) "two

1

years plus three years, stayed pursuant to section 654," on being a felon in possession of a .40

caliber handgun; and (4) "a concurrent two-year term" on being a felon in possession of a .380

caliber handgun.  (See Resp't's Lodged Doc. 1, at p. 2.).

Petitioner raised the following claims as stated in his federal habeas petition:

(1) "Petitioner was denied his Fourteenth Amendment guaranteed right to due process of law and

his Sixth Amendment guaranteed right to present a defense when the trial court ruled that his

alibi witness was unavailable and proceeded with the trial despite defense counsel's motions for

continuance and mistrial"  (Pet'r's Am. Pet. at p. 15.) ("Claim I"); (2) "The Court violated both

Petitioner's Sixth and Fourteenth Amendment rights by allowing the prosecutor to elicit

prejudicial information from a witness in front of the jury after she expressly refused to testify

and had previously been held in contempt by the Court" (Pet'r's Am. Pet. at p. 26.) ("Claim II");

and (3) "The Court's cumulative errors denied Petitioner his Constitutionally protected

guarantees to due process of law and to a fair trial" ("Pet'r's Am. Pet. at p. 33.) ("Claim III").  On

December 8, 2010, the undersigned issued findings and recommendations which recommended

that the habeas petition be denied.  On September 30, 2011, the District Judge adopted the

findings and recommendations as to Claims II and III.  The District Judge declined to adopt the

findings and recommendations "as to petitioner's claim that the court erred by finding witness

Roediger unavailable and thus denied him the right to compulsory process."  (Dkt. No. 33 at p.

2.)  Upon considering the issue returned to the undersigned for further findings, the argument

does not merit granting federal habeas relief.  Furthermore, in light of the District Judge's order

that Claim I was not completely analyzed in the previous findings and recommendations,

Petitioner's Claim III of cumulative error may need to be reexamined.  Upon reexamining Claim

III, taking into account the additional issue analyzed in this supplemental findings and

recommendations, Claim III continues to not merit granting federal habeas relief.

//

//

2

1    II.  FACTUAL BACKGROUND[1]

2    **The Shooting**

3    One evening in the summer of 2006, 16-year-old Angelo S.
     delivered some baby clothes to the home of [Petitioner's] cousin
4    Rudy, for Rudy's pregnant sister.  Angelo previously belonged to
     the Franklon gang, a subset of the Norteños.  Rudy believed
5    Angelo belonged to the Norteño gang because he wore baggy pants
     and carried a rag in his pocket.  Rudy had been previously
6    validated as a Norteño gang member.

7    As Angelo stood in the street, talking on the phone in front of
     Rudy's house, he saw a car drive by.  Angelo heard about six
8    gunshots and fell to the ground.  The gunfire wounded Angelo in
     the back, leg, and stomach, leaving him paralyzed.  At trial, Angelo
9    testified he did not see who was driving the car.  However, prior to
     trial Angelo told a detective that even if he knew who shot him, he
10   would not reveal the shooter's identity.  At trial, Angelo testified
     he did not know [Petitioner] and did not recognize him.  He also
11   denied telling Rudy someone named Perry shot him.

12   Rudy testified he was upstairs checking on his grandmother when
     he heard loud popping noises.  In an earlier statement to detectives,
13   Rudy stated he was outside when the shots were fired.

14   A neighbor identified Rudy's house as the Almeda house.  For five
     or six years, the neighbor saw [Petitioner] at the house several
15   times a week.  The neighbor heard the shots but did not see a car.
     He ran outside to help Angelo, who did not answer when asked
16   who shot him.  Immediately after the shooting Manuel Lopez and
     his daughter saw a white car with a "T-top" speed away.  Since the
17   car windows were tinted, the pair could not see who was driving.
     Lopez's daughter testified she recognized the car but had seen only
18   an older, grey-haired man driving it before.  Previously, she told an
     investigator she had seen [Petitioner] driving the car prior to the
19   night of the shooting.

20   A police officer located two .40-caliber shell cases on the ground
     near Angelo.  The cases were fired from the same gun.  Officers
21   also found a red towel and an expended bullet at the scene.

22   At trial, Rudy testified he did not see Angelo lying in the street and
     denied he saw a car drive by the house.  Previously, Rudy told

24   _____

         [1] These facts are from the California Court of Appeal's opinion issued on September 5,
25   2008 (hereinafter referred to as the "Slip Op.").  Pursuant to the Antiterrorism and Effective
     Death Penalty Act of 1996 ("AEDPA"), a determination of fact by the state court is presumed to
26   be correct unless Petitioner rebuts that presumption with clear and convincing evidence.  See 28
     U.S.C. § 2254(e)(1).

detectives [Petitioner] drove the car and the shots came from the passenger side through the back window.  Rudy also stated the car was a T-top.  At trial, Rudy denied making the statements.

**The Aftermath**

About two weeks after the shooting, detectives arrested [Petitioner].  Initially, the officers conducted a traffic stop for the car [Petitioner] was believed to be driving.  They arrested Perry Trujillo, the driver, and detained a passenger, Irene Medina.  Trujillo was a Norteño gang member.  Shortly after officers arrested Trujillo, they arrested [Petitioner] at a nearby residence.  [Petitioner] had keys for a Nissan Murano in his pocket that he wanted to give to a friend.  Officers impounded the Murano as evidence.  When they later obtained a search warrant for the vehicle, they located under the front passenger seat a .380-caliber handgun containing nine live rounds.  The gun yielded no identifiable prints.

[Petitioner's] girlfriend, Jevon Brown, testified she owned the Murano.  Before leaving on a trip the day before [Petitioner's] arrest, Brown gave the car to her mother.  She never gave [Petitioner] permission to drive the car while she was gone.  Brown did not own a gun.  A detective testified Brown told him she gave her mother the car keys so that [Petitioner] could pick up the car and put new rims on it.  Brown also told the detective the gun found in the car must have been [Petitioner's].  At trial, Brown denied the comments.

**Gang Evidence**

A gang expert testified that he believed [Petitioner], Perry, Rudy, and Angelo all belonged to the Norteño gang.  The expert also testified that various Norteño factions sometimes clash.  According to the expert, Angelo was responsible for shooting [Petitioner] in the leg about a year before Angelo was shot.  Based on the evidence, the expert opined that the shooting was committed for the benefit of, and in association with, the Norteño gang.

**Defense Case**

[Petitioner] presented his own gang expert.  [Petitioner's] expert stated the term "Norteño" refers to an identity as opposed to a particular gang.  Based on the evidence, the expert could not determine the shooting was related to gang activity.

(Slip Op. at p. 2-5.)

## IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state

4

court can only be granted for violations of the Constitution or laws of the United States.  See 28 U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S. 320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in the state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  See 28 U.S.C. 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable application clause, a federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."  Id. at 411.  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is an objectively unreasonable application of clearly established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only the Supreme Court's precedents are binding . . . and only those precedents need be reasonably

1   applied, we may look for guidance to circuit precedents.").

2                        V.  ANALYSIS OF PETITIONER'S CLAIMS

3       A.  Claim I

4        In the September 30, 2011 order, the District Judge found that the undersigned addressed

5   the denial of the mistrial and continuance within Claim I, but not Petitioner's argument that the

6   court denied him his right to compulsory process by discharging the bench warrant even though

7   the witness was not truly unavailable.  (See Dkt. No. 33 at p. 1-2.)  Subsequently, the District

8   Judge only adopted the findings and recommendations as to Claims II and III.  Therefore, it

9   appears as if the portions of Claim I that addressed the state court's denial of a mistrial and a

10   continuance have not yet been decided by the District Judge.  Accordingly, those two issues will

11   also be addressed in this supplemental findings and recommendations.

12             i.  Denial of Motions for Continuance and Mistrial

13        In Claim I, Petitioner argues his Sixth and Fourteenth Amendment rights were violated

14   "by the Court's improper ruling . . . that petitioner's alibi witness was legally unavailable and

15   that the trial should proceed despite defense counsel's requests of continuance and mistrial."

16   (Pet'r's Am. Pet. at p. 16.)  Petitioner asserts his "alibi witness, Faye Roediger, was never

17   allowed to testify due to" this ruling.  (Id.)

18           1.  State Court Decision

19       The California Court of Appeal rejected this claim, stating, in part:

20          **Motions for Continuance and Mistrial**

21          [Petitioner] argues the trial court erred in denying both his motion
            for a continuance and motion for a mistrial.  According to
22          [Petitioner], the court denied him his right to present a defense by
            proceeding to trial even though an alibi witness was considered
23          unavailable.  [Petitioner] contends that under Evidence Code
            section 240, the witness should not have been deemed unavailable.
24

25          ***Background***

26          An investigator for Trujillo interviewed Faye Roediger, who stated
         [Petitioner] was with her at a hotel in Sacramento at the time of the

shooting.  Roediger also provided the investigator with a statement from the hotel, showing she had been registered on the date in question and had charged movies, music, and phone calls to her room.

According to Roediger, she met Trujillo around noon the day of the shooting.  The pair picked up [Petitioner] and a woman named Monica, and the quartet went to a hotel.  Roediger rented a room and for the rest of the day the group stayed in the room.  Around 11:00 p.m., Roediger left to get dinner.

Roediger gave a similar account to [Petitioner's] investigator. Roediger stated she and her friend Christina picked up Trujillo on the afternoon of the day of the shooting.  They picked up [Petitioner], Monica, and Irene Medina that evening.  Everyone went to the hotel, and Roediger and [Petitioner] split the cost of the room.  Everyone stayed in the room until 11:00 p.m., when Roediger and Christina went out to buy food.  Roediger stayed in the room for an hour after she returned.  She went home, leaving everyone else in the room.

Defense counsel served Roediger with a subpoena commanding her presence at trial on March 26, 2007.  Roediger failed to appear. The trial court issued a bench warrant.  On April 26, 2007, during opening statement at trial, defense counsel informed the jury he intended to call Roediger as a witness, and she would testify that [Petitioner] was with her at a hotel at the time of the shooting.

On May 8, 2007, the trial court determined that there were two outstanding warrants for Roediger's arrest.  The court also stated: "As a material witness [Roediger's] testimony is highly relevant and important to the defense since the defense in this case appears to be alibi."  Roediger's attorney told the court that she was under medical supervision and was not able to leave the medical facility. He stated Roediger was not "avoiding court forever" but was "simply asking for a recess until she's medically cleared."

The following day, the trial court recalled and dismissed the bench warrant since Roediger was unable to leave the medical facility. The Betty Ford Center in Rancho Mirage sent a letter to Roediger's attorney, stating:  "This letter is to inform you that Faye Roediger is presently attending the Intensive Outpatient Program at the Betty Ford Center.  She was admitted May 07, 2007 and her projected discharge date is June 29, 2007."

[Petitioner] moved for a continuance and, in the alternative, for a mistrial.  The court allowed additional time for counsel to determine whether a conditional examination of Roediger was a possibility.  Roediger's attorney stated he believed the facility would not allow the use of video cameras.

On May 14, 2007, defense counsel stated he did not know Roediger's location.  Roediger's attorney notified the court that Roediger remained at the facility, the facility's attorneys had been contacted, and that it would be a "long and involved process."

The court denied both of [Petitioner's] motions.  The court found Roediger unavailable.  Next, the court inquired as to whether any exception to the hearsay rule would permit the admission into evidence of Roediger's prior statement to an investigator, and concluded no exception applied.

The court also indicated it was not inclined to order the county sheriff to travel to a far county to retrieve the witness.  The court noted that not only was the witness far away, but Roediger was also receiving drug therapy and medical personnel would not allow her to travel.  The court excluded Roediger's prior statements to investigators.

### Unavailability of Roediger

At the outset, the parties disagree over the meaning of the court's determination that Roediger was "unavailable."  [Petitioner] argues the trial court erred in finding Roediger unavailable, invoking Evidence Code section 240, subdivision (a).  The People disagree, arguing section 240 does not apply.

[Petitioner] concedes a finding of witness unavailability under Evidence Code section 240 "more often arises in cases where a party moves to introduce prior testimony of a witness who cannot testify in person at trial, [but] nothing in that statute limits that definition to those situations, and the definition is equally applicable to the facts here."

Unfortunately, [Petitioner] provides absolutely no authority for his assertion that Evidence Code section 240 applies to the situation in the present case.  Nor did the trial court invoke section 240 during the discussions over Roediger's "availability."  The court simply determined Roediger was unavailable as a witness at that time.  Section 240 is not relevant to the resolution of this appeal.

### Continuance

[Petitioner] argues the court erred in denying his motion for a continuance.  When a party seeks a continuance to secure the attendance of a witness, the party must show:  (1) he or she has exercised due diligence to secure the witness's attendance, (2) the witness's expected testimony is material and not cumulative, (3) the testimony can be obtained within a reasonable time, and (4) the facts to which the witness would testify cannot otherwise be proven. (People v. Jenkins (2000) 22 Cal.4th 900, 1037 (Jenkins).)

1    We review a court's denial of a motion for a continuance under an
     abuse of discretion standard.  (Jenkins, supra, 22 Cal.4th at p.
2    1037.)  [Petitioner] bears the burden of showing the court abused
     its discretion, i.e., that the court's decision exceeds the bounds of
3    reason under the circumstances.  (People v. Beeler (1995) 9 Cal.4th
     953, 1003; In re Lawanda L. (1986) 178 Cal.App.3d 423, 428.)
4    Here, although the trial court expressed its belief that Roediger's
     testimony was material, [Petitioner] cannot show Roediger's
5    testimony could have been obtained within a reasonable time.
     Roediger was enrolled in the Intensive Outpatient Program at the
6    Betty Ford Center with a scheduled release date of June 29, 2007,
     51 days from the date of [Petitioner's] motion for a continuance.
7
     Under the circumstances, the court did not abuse its discretion in
8    denying the motion.  The court allowed counsel almost a week to
     gather more information about Roediger's availability and the
9    possibility of a conditional exam.  The court's decision not to
     continue the trial for 51 days when all the evidence except for
10   Roediger's testimony had been presented was not an unreasonable
     abuse of discretion.
11
     ***Mistrial***
12
     [Petitioner] also argues the trial court abused its discretion in
13   denying his motion for a mistrial based on Roediger's
     unavailability to testify.  According to [Petitioner], the court's
14   denial of his motion prevented him from receiving a fair trial.

15   Due process affords a defendant a meaningful opportunity to
     present a complete defense.  (California v. Trombetta (1984) 467
16   U.S. 479, 485 [81 L.Ed.2d 413, 419].)  The trial court should grant
     a motion for a mistrial only when a party's chances of receiving a
17   fair trial have been irreparably damaged by an error.  We review
     the court's denial of a mistrial motion for an abuse of discretion.
18   (People v. Ayala (2000) 23 Cal.4th 225, 282.)

19   [Petitioner] argues the lack of Roediger's testimony deprived him
     of the ability to present a complete defense.  However, although
20   Roediger did not testify regarding [Petitioner's] alleged alibi,
     nothing prevented [Petitioner] from presenting testimony by the
21   other occupants of the hotel room on the day in question.
     [Petitioner] argues "[t]here could be [a] myriad [of] other reasons
22   why [Petitioner] could not, or chose not to, offer the testimony of
     others present in the hotel room that evening."  Regardless of the
23   reasons [Petitioner] chose not to use other avenues to pursue an
     alibi defense, we cannot, under the circumstances, find the trial
24   court abused its discretion in denying [Petitioner's] motion for a
     mistrial.

25

26   (Slip Op. at p. 6-11.)

2.  Analysis of Denial of Motion for Continuance

Trial courts are accorded broad discretion on matters regarding continuances.  See Morris v. Slappy, 461 U.S. 1, 11-12 (1983); Ungar v. Sarafite, 376 U.S. 575, 589 (1964).  However, there are cases holding that a trial court's failure to grant a defendant a continuance may violate a defendant's right to due process or other constitutional rights.  See, e.g., Schrader v. Whitley, 904 F.2d 282, 288 (5th Cir. 1990) (right to confront witnesses); Armant v. Marquez, 772 F.2d 552, 556-58 (9th Cir. 1985) (Sixth Amendment right to self-representation), Bonin v. Vasquez, 807 F. Supp. 589, 608 (C.D. Cal. 1992) (effective assistance of counsel), aff'd, 59 F.3d 815 (9th Cir. 1995).

"[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'" violates a defendant's rights.  See Morris, 461 U.S. at 11-12; Armant, 772 F.2d at 556.  In Armant, the Ninth Circuit recited the four factors used to determine whether the trial court abused its discretion in denying a requested continuance:  (1) the degree of diligence by the petitioner prior to seeking the continuance; (2) whether the continuance would have served a useful purpose; (3) whether the continuance would have inconvenienced the court or the prosecution; and (4) the amount of prejudice suffered by the petitioner.  Armant, 772 F.2d at 556-57; see also Gallego v. McDaniel, 124 F.3d 1065, 1072 (9th Cir. 1997).

The California Court of Appeal determined that the trial court's denial of the continuance request was not an abuse of discretion.  Roediger was "subpoenaed as a witness by the defense" and failed to appear.  (See Reporter's Tr. at p. 822-23.)  On May 8, 2007, Kenneth Rosenfeld, Roediger's counsel, appeared, and explained to the trial court Roediger had two bench warrants[2] for her arrest due to her failure to appear.  (Id.)  Defense counsel then asserted that Roediger was a "highly relevant" witness, which the trial court restated:

[DEFENSE COUNSEL:]  [Roediger] is -- I don't think there is any

---

[2] The trial court in the instant case issued one of the bench warrants, and the other bench warrant was "issued by Judge Bakarich in department 4."  (See Reporter's Tr. at p. 958.)

1   question she is highly relevant.

2   THE COURT:  Okay.  As a material witness[,] her testimony is
    highly relevant and important to the defense since the defense in
3   this case appears to be [an] alibi.

4   (Id. at p. 824.)  Defense counsel added he was trying to locate Roediger, and his "investigator has

5   come up with more or less [a] dead end."  (Id.)

6        The trial court recounted that Roediger was in rehabilitation for a serious addiction.  (Id.)

7   Rosenfeld admitted his client was "under medical supervision at this time and not free to leave

8   where she is at right now."  (Id. at p. 825.)  Rosenfeld stated "the process of gathering

9   information to show good cause" for why Roediger did not appear was not a simple, "overnight

10  procedure," (Id. at p. 827.), and at that time, Rosenfeld also did not know when Roediger would

11  be available.  (Id. at p. 828.)  Rosenfeld requested until tomorrow, May 9, 2007, to gather

12  information, which the trial court granted.  (Id. at p. 832-33.)

13       On May 9, 2007, the trial court dismissed the second bench warrant while the first bench

14  warrant for Roediger remained in place.  (See id. at p. 958.)  The trial court then stated it wanted

15  to disclose the date when Roediger would be available so "the court can determine whether or

16  not it's an abuse of discretion to grant or deny that continuance."  (Id. at p. 960.)  Roediger's

17  attorney agreed, "Absolutely, Your Honor."  (Id.)  It was then disclosed that Roediger "would be

18  available 51 days from today on the 29th of June."  (Id.; see also Augmented Clerk's Tr. vol. 1.)

19  Defense counsel moved for a continuance, and, if that was denied, then for mistrial.  (See

20  Reporter's Tr. at p. 960.)  The trial court brought up that "[t]here is . . . the possibility of a

21  conditional exam."  (Id. at p. 961.)  The court gave the parties until May 14, 2007, to determine

22  whether the parties could "either schedule a conditional exam or have another witness or have

23  closing arguments."  (Id. at p. 1001.)

24       On May 14, 2007, Rosenfeld was unable to appear, but did tell defense counsel, who

25  relayed the message to the trial court, that Rosenfeld "ha[d] nothing new to add to the

26  representations or statements or otherwise that he has given to the court."  (Id. at p. 1002-03.)

11

1   The trial court verified the message:

2           THE COURT:  All right.  [Rosenfeld] notified the court that
        nothing has changed, that the only new information that I have is
3       the attorneys who represent the place where [Roediger] is -- it's a
        major law firm in New York City and that the place has been
4       contacted and it is a long and involved process.

5   (Id. at p. 1003.)  The trial court then denied the motions for continuance and mistrial.  (See id.)

6           The record shows the California Court of Appeal properly found that "the court allowed

7   counsel almost a week to gather more information about Roediger's availability and the

8   possibility of a conditional exam."  (Slip Op. at p. 10.)  Granting the continuance would have

9   inconvenienced the trial court because the trial would have to be continued for "51 days when all

10  the evidence except for Roediger's testimony had been presented."  (Id.)

11          Additionally, the Ninth Circuit has stated that "[w]here denial of a continuance prevents

12  the introduction of specific evidence, the prejudice inquiry focuses on the significance of that

13  evidence."  United States v. Mejia, 69 F.3d 309, 317 (9th Cir. 1995).  Petitioner argues that the

14  purported significance of Roediger's testimony is that she would provide an alibi.  Nevertheless,

15  as the Court of Appeal noted, there were other witnesses purportedly with Petitioner in the hotel

16  room who could also have testified to Petitioner's purported alibi besides Roediger.  Roediger

17  was not the only person who could have testified to Petitioner's purported alibi at the Embassy

18  Suites Hotel in Old Sacramento.  Petitioner stated in his amended federal habeas petition that:

19          Testimony adduced at trial indicated that Victim, Angelo S., was
        shot shortly before 9:00 p.m. on the evening of July 5, 2006.  On
20      September 15, 2006, co-defendant Perry Trujillo's defense
        investigator, Art Martinez, interviewed Faye Roediger, who stated
21      she met Perry Trujillo at a market near noon on July 5, 2006 and
        that she and Trujillo then picked up petitioner and a woman named
22      Monica at Monica's residence; at approximately 12:30 p.m.  They
        all went to the Embassy Suites Hotel in Old Sacramento, where
23      Roediger rented them a room using her ATM card; all four of them
        remained in the room, without leaving, for the rest of July 5, until
24      approximately 11:00 p.m., at which point Roediger left to buy
        dinner and Trujillo was asleep in the room.

25

26  (Id. at p. 16-17.)  Later on his amended federal habeas petition, Petitioner stated that:

                                        12

1
2
3
4
5
6
7

> On March 21, 2007, Roediger was interviewed by telephone by James Wagoner, [P]etitioner's defense investigator. Roediger stated that she and her friend Christina picked up Trujillo in the afternoon of the day in question and then picked up petitioner, Monica and Irene Medina at approximately 6:15 p.m.; they all arrived at the Embassy Suites in Old Sacramento at approximately 6:30 p.m.; [P]etitioner and she split the cost of the room; he gave her cash towards the entire amount, which she put on her ATM card; they all remained in the room until 11:00 p.m., at which point Roediger and Christina went out to buy food for everyone, leaving the remaining four in the hotel room; Roediger stayed in the room for another hour after she returned with the food, then returned to her home to sleep, leaving the four in the room overnight.

8    (Id. at p. 17.) Roediger's testimony was less significant by the presence of these other potential

9    alibi witnesses such that Petitioner failed to show prejudice. Based on these foregoing reasons,

10   habeas relief is not warranted because Petitioner failed to show that the state court's denial of the

11   motion for a continuance was based on an unreasonable application of clearly established federal

12   law.

13                          3. Analysis of Denial of Motion for Mistrial

14           Under both California and federal law, the decision on whether to grant a mistrial motion

15   also is within the trial court's discretion. See Corley v. Cardwell, 544 F.2d 349, 351 (9th Cir.

16   1976) ("The trial judge has a broad discretion in granting a mistrial . . . and the burden is on the

17   defendant to establish an abuse of that discretion." (citing Illinois v. Somerville, 410 U.S. 458

18   (1973); Oelke v. United States, 389 F.2d 668 (9th Cir. 1967))); People v. Cox, 30 Cal. 4th 916,

19   953, 135 Cal. Rptr. 2d 272, 70 P.3d 277 (2003) ("We review the denial of a motion for mistrial

20   under the deferential abuse of discretion standard. A motion for mistrial is directed to the sound

21   discretion of the trial court." (citations omitted)). To establish a due process violation from

22   trial-type error, such as the denial of a mistrial motion, the petitioner must show that the error

23   resulted in a trial that was fundamentally unfair. See Estelle v. McGuire, 502 U.S. 62, 70-71, 75

24   (1991); Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986) (as amended).

25           Petitioner has not shown that the denial of his motion for a mistrial amounted to an

26   unreasonable application of clearly established federal law. Although it was determined that

1   Roediger was unavailable to testify at the time of the trial, through no fault of the trial court,

2   Petitioner still had a fair opportunity to present a defense.  According to Roediger, she and

3   Petitioner were with other individuals at the time of the shooting, who could have provided an

4   alibi defense.  (See Slip Op. at 6-7.)  The trial court did not prevent Petitioner from calling the

5   others as alibi witnesses, and nothing in the record shows Petitioner attempted to call them as

6   witnesses.

7        Furthermore, the evidence of Petitioner's guilt was strong.  Detective Hanspeter Merten

8   testified that Rudy told him Petitioner "had been the driver in a vehicle that had shot at his

9   friend[,] Mr. Savala[,] and he stated it was his cousin."  (See Reporter's Tr. at p. 619.)

10  According to Detective Merten, Rudy also said the vehicle was a "T-top."  (Id. at p. 636.)  Dale

11  Joe, an investigator for the District Attorney's office, also testified that Felicia Servantes told him

12  that she had seen Petitioner driving the white "T-top" vehicle.  (See Reporter's Tr. at p. 993-94.)

13  Additionally, Detective Alvaro Sanchez testified that Jevon Brown, Petitioner's girlfriend, told

14  Detective Sanchez that the black gun "must belong to [Petitioner] since he was driving the car

15  Tuesday."  (Reporter's Tr. at p. 425.)  Other exhibits admitted into evidence also showed

16  Petitioner holding a black gun.  (See Augmented Clerk's Tr. vol. 2, 4-5.[3])  For the foregoing

17  reasons, the California Court of Appeal's rejection of Petitioner's claim relating to the denial of

18  the mistrial motion was neither contrary to, nor an unreasonable application of, clearly

19  established federal law.

20        ii.  Denial of Right to Compulsory Process

21        As previously stated, the District Judge determined that the previous findings and

22  recommendations failed to address Petitioner's argument that "the court denied him his right to

23  compulsory process by discharging the bench warrant even though the witness was not truly

24  _____

25        [3] Two volumes were labeled under Lodged Document 8:  (1) the first volume of the
    Augmented Clerk's Transcript; and (2) the second volume of what was labeled as the "Clerk's
26  Transcript."  It is assumed that this second volume was mislabeled and is part of the Augmented
    Clerk's Transcript, not the Clerk's Transcript.

1   unavailable." (Dkt. No. 33 at p. 2.)  Respondent argues that this argument is unexhausted.  More

2   specifically, Respondent asserts:

3               Petitioner has never raised an independent claim that his right to
            compulsory process was violated by the trial court.  In the

4               California Court of Appeal and the California Supreme Court,
            Petitioner consistently presented the claim at issue as part and

5               parcel of his claim that the trial court's denials of his motions for a
            continuance and for a mistrial constitutes a violation of his

6               constitutional right to present a defense.

7   (Dkt. No. 39 at p. 2.)  The District Judge determined that Petitioner raised a separate Compulsory

8   Process Clause argument as stated on pages 22-23 of his amended federal habeas petition.  This

9   portion of Petitioner's amended federal habeas petition is similar to and almost identical to the

10  same arguments Petitioner made in his petition for review to the California Supreme Court.

11  (See Resp't's Lodged Doc. 6, at p. 18-20.).  To exhaust state remedies, the prisoner must "fairly

12  present" both operative facts and federal legal theory supporting his federal claim to the state's

13  highest court, "thereby alerting that court to the federal nature of the claim."  Baldwin v. Reese,

14  541 U.S. 27, 29 (2004).  As Petitioner's amended federal habeas petition and his petition for

15  review to the California Supreme Court are so similar, and the District Judge has already

16  determined that the amended federal habeas petition raised a Compulsory Process Clause

17  argument, this argument should be deemed exhausted.

18          Nevertheless, it does not appear as if there is a reasoned decision from a state court

19  decision which articulates a basis for rejecting Petitioner's Compulsory Process Clause

20  argument.  In such a situation, a federal habeas court independently reviews the record to

21  determine whether the state court's decision was contrary to, or an unreasonable application of

22  clearly established federal law.[4]  See, e.g., Cullen v. Pinholster, 131 S.Ct. 1388, 1402 (2011)

23  _____

24          [4] It is also worth noting that even if Petitioner's separate Compulsory Process Clause
    argument was deemed unexhausted, it could be denied on the merits as well as an unexhausted

25  claim can still be denied on the merits when it is perfectly clear that the claim is not "colorable."
    See Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005).  For the reasons discussed infra,

26  Petitioner failed to show even a "colorable" Compulsory Process Clause violation based on the
    discharge of one of the two outstanding bench warrants.

15

1   ("Section 2254(d) applies even where there has been a summary denial.").

2          The Sixth Amendment states that, "[i]n all criminal prosecutions, the accused shall enjoy

3   the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const.

4   amend VI.  "[T]he Compulsory Process Clause guarantees a criminal defendant the right to

5   present relevant and material witnesses in his defense . . . ."  Williams v. Stewart, 441 F.3d 1030,

6   1055 (9th Cir. 2006) (internal quotation marks and citations omitted).  In Washington v. Texas,

7   388 U.S. 14, 19 (1967), the Supreme Court held that the right of an accused to have compulsory

8   process for obtaining witnesses in his or her favor applies in state criminal proceedings.  The

9   Supreme Court observed:

10              The right to offer the testimony of witnesses, and to compel their
               attendance, if necessary, is in plain terms the right to present a
11              defense, the right to present a defendant's version of the facts as
               well as the prosecution's to the jury so that it may decide where the
12              truth lies.  Just as an accused has the right to confront the
               prosecution's witnesses for the purpose of challenging their
13              testimony, he has the right to present his own witnesses to establish
               a defense.  This is a fundamental element of due process of law.
14

15   Id.  "[A]t a minimum . . . criminal defendants have the right to the government's assistance in

16   compelling the attendance of favorable witnesses at trial and the right to put before a jury

17   evidence that might influence the determination of guilt."  Pennsylvania v. Ritchie, 480 U.S. 39,

18   56 (1987).  Nevertheless, the compulsory process right is not absolute; when requesting a court to

19   subpoena a witness, the defendant has a duty to demonstrate the necessity of the witness's

20   testimony.  See, e.g., United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982).  A violation

21   of the Compulsory Process Clause of the Sixth Amendment "requires some showing that the

22   evidence lost would be both material and favorable to the defense."  See id. at 873.  In

23   Valenzuela-Bernal, the Supreme Court stated that to show materiality, a plausible showing must

24   be made illustrating that the witness's testimony would not have been merely cumulative to the

25   testimony of available witnesses.  See id.

26          The District Judge determined that the previous findings and recommendations failed to

16

consider whether Petitioner's compulsory process rights were violated when the trial judge

discharged a bench warrant for Roediger.  Petitioner is not entitled to federal habeas relief on this

argument however because, even assuming *arguendo* that the discharge of that bench warrant

was in error, at the time the bench warrant was discharged, there was an additional outstanding

bench warrant for Roediger.  In fact, the first bench that was issued against Roediger was not

dismissed until after Petitioner's conviction.

On March 26, 2007, a bench warrant was issued by Judge Bakarich due to Roediger's

failure to appear in this case.  (See Clerk's Tr. at p. 12.)  Later on in the case, a second bench

warrant was issued by the trial judge, Judge Sapunor, due to Roediger's failure to appear.  When

Judge Sapunor ultimately discharged the bench warrant that he had issued, he indicated that there

still remained an outstanding bench warrant for Roediger.  Illustrating these facts is the following

colloquy between the trial judge, Petitioner's trial attorney (Mr. Lippsmeyer) and Ms. Roediger's

attorney (Mr. Rosenfeld):

> THE COURT:  I think it would be safe to say that you have
> verified that she is receiving treatment.
> MR. ROSENFELD:  Yes, Your Honor.
> THE COURT:  All right.
> MR. LIPPSMEYER:  Your Honor, I don't have any problem with
> ex parte communications as long as somebody's got something to
> review on appeal.  [¶]  But ex parte communications of which there
> is no record makes that a bit difficult.  [¶]  I can walk away from
> the courtroom and my client can go do his thing.  I don't have any
> problem with that.  But it's – it's very hard to say it's – we don't do
> it that way.
> THE COURT:  I think the record already reflects pretty much what
> the situation is.  And she is undergoing intensive treatment and will
> not be released.
> MR. ROSENFELD:  Could I ask the court, considering the
> information that I have, place it under seal for the record and that
> in that way the court should there ever be an appeal would have –
> THE COURT:  Right.
> MR. ROSENFELD:  – materials under seal to be able to review.
> THE COURT:  And that will be the order of the court.  Here they
> are.
> THE CLERK:  Yes.  [¶]  Thank you.
> MR. LIPPSMEYER:  Okay.  There is no document then or – there
> is something that is from the health care provider at least?
> THE COURT:  There are documents that I think a reviewing court

17

1    could use to determine whether or not I have made a mistake.
     MR. LIPPSMEYER:  Okay.  That's fair.
2    THE COURT:  Or whether I made a – made a mistake in relying
     on the document.  [¶]  But there are documents under seal that will
3    not be ordered unsealed unless it's by this court or another court.
     MR. LIPPSMEYER:  We are not planning on going to another
4    court.  So that's fine.
     THE COURT:  All right.  So insofar as how we'll proceed there is
5    still a bench warrant outstanding for her.  [¶]  So if that warrant is
     served and she is taken into custody, then obviously she would be
6    eventually transported here for the purpose of giving testimony.
     MR. ROSENFELD:  I would ask the court to consider recalling the
7    warrant in that her non-appearance is not willful, Your
     Honor.  [¶]  I provided the court documentation that she is in a
8    place in which she is not free to come and go as she pleases.
     THE COURT:  My understanding of the situation, counsel, is that
9    these – if she tells staff I'm leaving, they will not allow her to do
     that.
10   MR. ROSENFELD:  That's my understanding too, Your Honor.
     THE COURT:  This is the situation where they can prevent her
11   from leaving.  So she would not be able to comply with the court
     order because she would not be allowed to leave.
12   MR. ROSENFELD:  This is my understanding pursuant to the
     agreements that are signed prior to admission.
13   THE COURT:  So whether she is willing or not she's unable to
     attend these proceedings and give evidence.
14   MR. ROSENFELD:  That's my understanding also, Your Honor.
     THE COURT:  So that being the case, I think it would be
15   appropriate to recall the bench warrant because the failure to
     appear does not appear to be willful.
16   MR. LIPPSMEYER:  The logic on it is convoluted because the
     failure to appear presumably – unless you know that she went into
17   treatment on March – I believe it's March 23rd that the subpoena
     was for originally.  It was the original failure to appear and the
18   bench warrant issued on that.  [¶]  Anything that in terms of she
     may not be able to comply with a present day agreement or she –
19   she was probably – I'm trying to think when I talked to her –
     probably at the beginning of April sometime.  I think she was out
20   of any facility, et cetera, et cetera, able to comply, and agreed to
     come in at that time.  I don't have it – the exact date in mind, but
21   somewhere around April – I don't know – 5th, 6th.  Something like
     that.  [¶]  Now you're saying, oh, she can't comply with
22   whatever.  [¶]  There's no way to excuse that failure to appear and
     that's why a bench warrant issued.
23   THE COURT:  That is the one in April.
     MR. LIPPSMEYER:  Yes, sir.
24   THE COURT:  Right.
     MR. LIPPSMEYER:  The one in March.
25   THE COURT:  Okay.  [¶]  Well, this would apply to my bench
     warrant that I issued the other day.
26   MR. LIPPSMEYER:  Sure.  [¶]  Yeah.

                                    18

1    THE COURT: *But I – I don't think it would apply to the bench*
     *warrant issued by Judge Bakarich in department 4.*
2    MR. ROSENFELD: I would agree with that.
     THE COURT: *So my warrant is recalled and dismissed.*
3    MR. LIPPSMEYER: Okay.
     THE COURT: Because at the time that was issued I don't believe
4    she had the ability to be present. [¶] *But as far as Judge*
     *Bakarich's is concerned that's related to a different date and a*
5    *different failure to appear. And I think that has to remain*
     *outstanding, and she would be required to – at some point she*
6    *should be held in contempt for missing that date.*
     MR. ROSENFELD: And I don't have any information of what the
7    cause would be. So –
     THE COURT: Right.
8    MR. ROSENFELF: I respect the court's ruling in that respect.
     THE CLERK: The issue – the warrants I should point out were
9    issued on the same day by two different people roughly almost at
     the same time.
10   MR. LIPPSMEYER: Well, I –
     THE COURT: Wait a minute. [¶] What day was that?
11   THE CLERK: When we initially issued a warrant – I can't tell
     from the court file if it was a mistake – that they entered the same
12   warrant twice – or it was as Mr. Lippsmeyer points out that they
     understood the order to be one from Bakarich and one from you,
13   because the warrants were issued relatively – almost concurrently.
     MR. LIPPSMEYER: The bench warrant that was issued was
14   asked to be stayed in the assignment department, department 4, and
     presumably – I don't know if it's an error or if it's what he said.
15   THE COURT: I don't recall if Bakarich recalled the most recent
     S.A. number, which would be the one issued the other day.
16   THE CLERK: One ends 76. One is 80. [¶] So we'll recall
     warrant number 80 and then leave 76, which is Bakarich's
17   warrant?
     THE COURT: Right. [¶] Okay. All right. [¶] Well, I think they
18   have that straightened out. *I think that's a clerical problem which*
     *doesn't relate to the merits of whether the original warrant should*
19   *have been issued. That's the Judge Bakarich – the Judge Bakarich*
     *warrant.*
20   MR. LIPPSMEYER: *Right.*
     THE COURT: *That remains outstanding.*
21

22   (Reporter's Tr. at p. 954-60 (emphasis added).)  Thus, it appears that at all times after Roediger's

23   initial failure to appear after being served with a subpoena, a bench warrant remained

24   outstanding.  It was only after Petitioner was tried and eventually convicted on May 16, 2007,

25   that the state court dismissed the original bench warrant against Roediger.  (See Clerk's Tr. at p.

26   16 (indicating that witness warrant against Roediger dismissed on May 17, 2007).)

19

1     "Where compulsory process has been issued, served and has proved ineffective, and the

2     court has issued a bench warrant for the witness, neither the court, nor the prosecutor can be

3     chargeable with error because the defendant failed to secure the witness.  See People v. Avila,

4     253 Cal. App. 2d 308, 330, 61 Cal. Rptr. 441 (1967), disapproved on other grounds, Eleazer v.

5     Superior Court, 1 Cal. 3d 847, 83 Cal. Rptr. 586, 464 P.2d 42 (1970).  A bench warrant remained

6     outstanding against Roediger throughout the trial pursuant to the Judge Bakarich bench warrant.

7     It does not appear from the record that Petitioner ever attempted to effectuate this bench warrant

8     even though Petitioner's counsel was present when Roediger's counsel attended the proceedings

9     to discuss her whereabouts and her failure to appear.  The apparent lack of diligence on the part

10    of Petitioner is fatal to his compulsory process argument light of the fact that there was always an

11    outstanding bench warrant for Roediger.  Thus, Petitioner's argument that his Compulsory

12    Process Clause rights were violated when the trial court dismissed the second bench warrant does

13    not warrant federal habeas relief.

14         Additionally, it would appear that Petitioner is not entitled to federal habeas relief on this

15    argument for yet another reason.  Petitioner asserts that Roediger's testimony was material

16    because she "could have established a complete alibi defense to the charges levied against

17    [P]etitioner by the prosecution."  (Pet'r's Am. Pet. at p. 17.)  However, Roediger was not the

18    only person who could have testified to Petitioner's purported alibi at the Embassy Suites Hotel

19    in Old Sacramento.  According to the habeas petition, there were other witnesses present who

20    could have testified to Petitioner's whereabouts on the night of the incident.  Most notably, in

21    Roediger's previous statements to the investigator, she mentioned Monica Medina along with

22    someone named Christina who were also purportedly present with Petitioner at the Embassy

23    Suites Hotel in Old Sacramento on the night of the incident.  Roediger's testimony would have

24    been cumulative of these other presumably available witnesses.  Petitioner has not shown that

25    these other witnesses were unavailable to testify nor does he state a specific reason why they

26    could not have been called as witnesses.  See Valenzuela-Bernal, 458 U.S. at 873 (stating that for

20

1   a Compulsory Process Clause violation a plausible showing must be made illustrating that the

2   witness's testimony would not have been merely cumulative to the testimony of available

3   witnesses).  Thus, for the foregoing reasons, Petitioner is not entitled to federal habeas relief on

4   this argument that his right to compulsory process was violated when the trial judge discharged

5   one of two outstanding bench warrants.

6          In his supplemental brief, Petitioner argues that the trial court violated his Constitutional

7   rights "by failing to deliberate regarding alternatives such as conditional examination or body

8   attachment writ."  (See Dkt. No. 40 at p. 7.)  First, it is worth noting that the District Judge only

9   remanded this matter to consider the issue of whether Petitioner's right to compulsory process

10  was violated by discharging the bench warrant.  However, these additional issues raised by

11  Petitioner relate to his argument that the District Court erred in denying his motion for a

12  continuance.  As discussed in the 2010 findings and recommendations as well as this

13  supplemental findings and recommendations, Petitioner failed to show that the state court

14  unreasonably applied clearly established federal law in denying the motion for a continuance.

15  Furthermore, the record as described supra indicates that the trial court did deliberate on the issue

16  of the possibility of conducting a conditional examination.

17         Petitioner also argues that he is entitled to federal habeas relief based upon the failure of

18  the trial court to issue a "body attachment writ."  Petitioner does not explain how the issuance of

19  a "body attachment writ" differs from that of a bench warrant.  As previously noted, a bench

20  warrant remained in place against Roediger due to her failure to appear notwithstanding the fact

21  that the trial court discharged one of the two outstanding bench warrants for Roediger's failure to

22  appear.

23         Finally, to the extent that these arguments are considered as part and parcel of Petitioner's

24  argument that his right to compulsory process was violated, Petitioner would not be entitled to

25  federal habeas relief.  As previously described, a bench warrant remained outstanding throughout

26  Petitioner's trial due to Roediger's failure to appear.  It appears as if Petitioner did not attempt to

1   effectuate this bench warrant.  Furthermore, Petitioner failed to show that Roediger's testimony

2   would not have been cumulative of other purportedly available witnesses who were present with

3   Petitioner on the night of the incident who could also have testified to support Petitioner's alibi

4   defense.  Thus, it appears as if Petitioner failed to show the requisite level of materiality of

5   Roediger's testimony.  See Valenzuela-Bernal, 458 U.S. at 873.  Roediger was purportedly just

6   one of a few witnesses who could have testified as to Petitioner's alibi defense.

7          For the foregoing reasons, Petitioner is not entitled to federal habeas relief on any of his

8   arguments within Claim I.

9          B.  Claim III

10          In the December 8, 2010 findings and recommendations, the undersigned recommended

11   that Claim III be denied.  (See Dkt. No. 30 at p. 26-27.)  The District Judge adopted this finding

12   in the September 30, 2011 order.  (See Dkt. No. 33 at p. 2.)  However, as the District Judge

13   determined that the December 8, 2010 findings and recommendations failed to address an

14   argument within Claim I, Petitioner's argument of cumulative error may need to be readdressed.

15          "Cumulative error occurs when although no single trial error examined in isolation is

16   sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still

17   prejudice[d] a defendant."  Wooten v. Kirkland, 540 F.3d 1019, 1022 n.1 (9th Cir. 2008)

18   (internal quotation marks and citation omitted).  A court "must ask whether the aggregated errors

19   so infected the trial with unfairness as to make the resulting conviction a denial of due process."

20   Jackson v. Brown, 513 F.3d 1057, 1085 (9th Cir. 2008) (internal quotation marks and citation

21   omitted).  "[W]here there is no single constitutional error existing, nothing can accumulate to the

22   level of a constitutional violation."  Fuller v. Roe, 182 F.3d 699, 704 (9th Cir. 1999), overruled

23   on other grounds by, Slack v. McDaniel, 529 U.S. 473 (2000).

24          As indicated supra, Petitioner failed to show that a violation occurred with respect to

25   Petitioner's right to compulsory process.  The addition of this argument does not warrant a

26   finding that cumulative error merits granting Petitioner federal habeas relief.

## VI.  MOTION TO EXPAND THE RECORD

Before filing his supplemental brief which addressed the Compulsory Process Clause argument, Petitioner filed a motion to expand the record.  (See Dkt. No. 38.)  Petitioner seeks to add to the record a declaration from his trial counsel which was executed March 27, 2012.  He argues that his trial counsel "has direct, first-hand, personal knowledge of facts that support [P]etitioner's claim that the trial court's discharge of the bench warrant was erroneous and irreparably vitiated Petitioner's constitutionally protected rights."  (Pet'r's Mem. P. & A. Supp. Mot. Expand Record at p. 2.)

The Supreme Court has recently held that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits" and "that evidence introduced in federal court has no bearing on" such review. Cullen v. Pinholster, 141 S.Ct. 1388, 1398, 1400 (2011).  Thus, Petitioner's motion to expand the record in these federal habeas proceedings will be denied.[5]  Furthermore, it is worth nothing that the record shows that there was an outstanding bench warrant based on Roediger's failure to appear in this case.  Additionally, as previously indicated, the record indicates that Roediger was not the only purported witness who could have testified as to Petitioner's alibi defense. Accordingly, Petitioner will not be permitted to expand the record in this federal habeas proceeding with his trial counsel's declaration.

## VII.  CONCLUSION

IT IS HEREBY ORDERED that Petitioner's motion to expand the record (Dkt. No. 38) is DENIED.

---

[5] Even if Petitioner's Compulsory Process Clause argument was analyzed under the lack of "colorability" standard due to its possible unexhaustion, the motion to expand the record would also still be denied.  As discussed supra, the District Judge determined that Petitioner's compulsory process argument related to the discharge of a bench warrant for Roediger.  As previously analyzed, the record is clear that a bench warrant remained outstanding for Roediger's failure to appear as there were two outstanding bench warrants and only one was discharged. Thus, expanding the record to include Mr. Lippsmeyer's declaration is not warranted because Petitioner cannot raise a "colorable" compulsory process argument based on the record.

1    IT IS HEREBY RECOMMENDED that Claims I and III of amended petition for writ of

2  habeas corpus be DENIED.[6]

3    The supplemental findings and recommendations is submitted to the United States

4  District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within

5  twenty-one days after being served with the supplemental findings and recommendations, any

6  party may file written objections with the court and serve a copy on all parties.  Such a document

7  should be captioned "Objections to Magistrate Judge's Supplemental Findings and

8  Recommendations."  Any reply to the objections shall be served and filed within seven days after

9  service of the objections.  The parties are advised that failure to file objections within the

10 specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

11 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a

12 certificate of appealability should issue in the event he elects to file an appeal from the judgment

13 in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must

14 issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

15 DATED:  June 19, 2012

16

17

18                                TIMOTHY J BOMMER
                                  UNITED STATES MAGISTRATE JUDGE
19

20

21

22

23

24

25

---

26  [6] The District Judge previously adopted the findings and recommendations on Claim II
which recommended denying Claim II in the September 30, 2011 order.  (See Dkt. No. 33.)

24